724 F.Supp. 808 (1989)
PARAMOUNT PICTURES CORPORATION, Plaintiff,
v.
VIDEO BROADCASTING SYSTEMS, INC., Video Broadcasting System of St. Louis; Tim Mead; the Show Machine, Inc. d/b/a Popcorn Video; Domino's Pizza, Inc.; Lakoduk Broadcasting Corporation d/b/a KICT-95 Radio; and Various John Does, Jane Does, and ABC Companies, Defendants.
No. 89-1412-C.
United States District Court, D. Kansas.
October 11, 1989.
*809 *810 *811 Monte Vines, Adams, Jones, Robinson and Malone, Wichita, Kan., Jeffrey L. Laytin, William M. Ried, Steven E. Seidenberg, Lewin & Laytin, New York City, for plaintiffs.
Steven D. Gough, Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kan., for The Show Mach., Inc. d/b/a Popcorn Video.
Thomas D. Kitch, William P. Tretbar, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for Domino's Pizza, Inc.
John H. Gibson, Boyer, Donaldson & Stewart, Wichita, Kan., for Lakoduk Broadcasting d/b/a KICT-95 Radio.
William L. Fry, Fry, White, Birch & Reeves, Wichita, Kan., for Video Broadcast Systems, Video Broadcast Systems, of St. Louis, Tim Mead, and The Show Mach., Inc. d/b/a Popcorn Video.

MEMORANDUM AND ORDER
CROW, District Judge.
The case comes before the court on the plaintiff's motion for a preliminary injunction and motion to strike certain portions of affidavits submitted by defendants in opposition to the plaintiff's first motion. Defendant Domino's Pizza, Inc. also moves to dismiss plaintiff's complaint pursuant to Fed.R.Civ.P. 12(b)(6) or, in the alternative, for summary judgment. On September 28, 1989, the court conducted a hearing on the preliminary injunction motion in which counsel for each party presented their arguments. The court took the motion under advisement for additional research and preparation of the following decision. As to the motion to strike portions of defendants' affidavits, the court agrees that certain statements contained therein are inadmissible hearsay, incompetent testimony, or matters outside of the affiant's personal knowledge. Rather than separately ruling on each of the portions that have been objected to, the court will simply recite those facts which are properly supported by affidavits.
Paramount Pictures Corporation (Paramount) is a corporation organized under the laws of Delaware and maintains its principal place of business at Los Angeles, California. For over 75 years, Paramount has been in the business of producing and distributing motion pictures. In May of 1979, Paramount began its home video business through its wholly-owned subsidiary, Paramount Home Video (PHV). PHV owns and obtains rights to reproduce and distribute videocassettes of motion pictures and programs recently produced by Paramount or independent producers, as well as videocassettes of those motion pictures held in Paramount's library of films. After determining an optimal release date for the videocassette, PHV develops a marketing plan for sales and then spends substantial sums marketing the video releases. Many of Paramount's sales are to distributors who then sell the videocassettes to retailers who, in turn, rent or sell the videocassettes to the public.
Paramount became the first motion picture studio to include commercials at the beginning of its produced videocassettes. The commercial was placed on the videocassette of "Top Gun" and advertised products of Pepsi Co., Inc. PHV has also placed Pepsi commercials on five other videocassettes *812 of Paramount pictures. Under its contract with Pepsi, PHV retains the authority to "reasonably approve" the content of Pepsi's video advertisement, and PHV is precluded from placing paid advertisements other than Pepsi's on the videocassette.
Paramount is the sole owner of the following incontestable trademarks: PARAMOUNT: A GULF + WESTERN COMPANY; STAR TREK; and PARAMOUNT: A GULF + WESTERN COMPANY: 75TH ANNIVERSARY. One or more of these trademarks appear on the recorded videotape portion of the videocassette, on the black plastic videotape cartridge, and on the cardboard sleeve for the videocassette.
Paramount holds certain copyrights in motion pictures and videocassettes as author and owner, author and licensee, or as licensee. The titles of those respective motion pictures and videocassettes are set forth in the plaintiff's complaint. Paramount places on the recorded videotape portion and the plastic cartridge an "FBI Copyright Warning" that states the videocassette can only be used for non-commercial private exhibition in homes and any public performance or copying of it is prohibited by copyright laws.
Defendant, Video Broadcasting Systems, Inc. (VBS), is a corporation organized under the laws of Kansas and has its principal place of business in Wichita, Kansas. Defendant Tim Mead is the sole executive officer of VBS. Defendant Video Broadcasting System of St. Louis is apparently a division of VBS. VBS is in the business of selling, producing and placing advertisements on the blank or lead-in tape of videocassettes rented or sold by the video retail stores to the public. VBS charges its advertising clients a fee for each videocassette upon which the advertisement is recorded. The video retail stores are in turn paid a fee for those advertisements placed upon their videocassettes.
As of June 9, 1989, VBS had forty-four active advertising clients, and their advertisements appear on videocassettes rented by twenty video retailers in Wichita, Kansas. One of these video retailers is defendant, The Show Machine Inc., d/b/a Popcorn Video (Popcorn). The recorded advertisements remain on the videocassette for at least three months. VBS does not erase the advertisements before the videocassette is later sold to the public. It is VBS' policy to record the advertisements only on the blank tape preceding the FBI warning.
VBS has recorded advertisements on videocassettes containing Paramount motion pictures and bearing Paramount's trademarks. Paramount did not authorize or consent to the placement of these advertisements. Among the products and services promoted by these commercials are those sold by the defendants originally named in this suit, including defendant, Lakoduk Broadcasting Corporation d/b/a KICT-95 Radio (KICT-95). Some of these advertisements overlapped the FBI warning and Pepsi commercials pre-recorded on the videocassettes sold by Paramount. Certain advertisements for Longneckers, Inc. also displayed Coca-Cola products and interrupted the pre-recorded commercial for Diet Pepsi.
Plaintiff filed its complaint on August 3, 1989, asserting nine counts for relief under three basic areas of law: trademark and/or unfair competition, copyright, and state common law. The next day plaintiff filed its motion for preliminary injunction with supporting memorandum. By the agreement of the parties, the motion was fully briefed and set for hearing on September 28, 1989. Each party chose to present nothing but arguments at the hearing. The only evidence submitted for the court's consideration was the affidavits and exhibits attached to their memoranda.
Plaintiff seeks to enjoin generally defendants from using Paramount's trademarks in a manner which is likely to cause others to believe that the defendants' advertisements are a part of or connected with plaintiff's product, from altering Paramount videocassettes by the addition of unauthorized advertisements, from creating and distributing derivative works from works in which plaintiff owns or is the exclusive licensee of the copyright, from interfering with plaintiff's prospective contractual relations *813 for authorized advertisements, and from "shipping, delivering, holding for sale, distributing, returning, transferring, or otherwise moving or disposing of in any manner" videocassettes bearing plaintiff's trademark or protected by plaintiff's copyright which have been altered by defendants prior to rental or sale.
A preliminary injunction is an extraordinary remedy which is granted as the exception rather than the rule. GTE v. Williams, 731 F.2d 676, 678 (10th Cir.1984). The grant or denial of a preliminary injunction rests within the sound discretion of the trial court. Amoco Oil Co. v. Rainbow Snow, 748 F.2d 556, 557 (10th Cir.1984). The primary purpose of a preliminary injunction is to preserve the status quo pending a final resolution of the merits, in order that the trial court could then render a meaningful decision. Tri-State Generation v. Shoshone River Power, Inc., 805 F.2d 351, 355 (10th Cir.1986).
The movant has the burden to establish by clear proof its right to a preliminary injunction. Penn v. San Juan Hospital, Inc., 528 F.2d 1181, 1185 (10th Cir.1975). Mere allegations are not sufficient. Kansas City, Kan. Frat. v. City of Kansas City, 620 F.Supp. 752, 768 (D.Kan.1984). The movant's burden is particularly heavy when the injunction sought would essentially grant plaintiff a substantial portion of the relief the plaintiff would later recover upon a trial of the merits. GTE Corp., 731 F.2d at 679; Kingsford Products Co. v. Kingsford, Inc., 674 F.Supp. 1428, 1432 (D.Kan.1987). Courts have broken down the movant's burden into four separate prerequisites: (1) it will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the movant outweighs whatever damage the injunction may cause the opposing party; (3) the injunction would not be adverse to the public interest; and (4) there is a substantial likelihood that the movant will eventually prevail on the merits. City of Chanute v. Kansas Gas & Elec. Co., 754 F.2d 310, 313 (10th Cir.1985).

LIKELIHOOD OF SUCCESS ON THE MERITS
Plaintiff must show its success on the pleaded claims is reasonably probable. Lundgrin v. Claytor, 619 F.2d 61, 63 (10th Cir.1980). The success of plaintiff's theories under the areas of trademark, copyright, and state common law turn upon common issues of law and fact which the court will identify and discuss for purposes of this motion.

Trademark and Unfair Competition
A trademark is a shorthand designation or symbol used to identify and distinguish a manufacturer's product. Beer Nuts, Inc. v. Clover Club Foods Co., 805 F.2d 920, 925 (10th Cir.1986). A trademark is also used to indicate the "source of the goods, even if that source is unknown." 15 U.S.C. § 1127. Once the manufacturer has achieved the consumer's association of the trademark with the quality and desirability of the manufacturer's products, then this symbol has gained a commercial value recognized and protected under the law. See Allen v. National Video, Inc., 610 F.Supp. 612, 625 (D.N.Y.1985). The overriding purpose of the trademark laws is, however, not to protect the trademarks but to shield the consumer from confusion. A.J. Canfield Co. v. Honickman, 808 F.2d 291, 304 (3rd Cir.1986).
Plaintiff grounds its trademark claims on § 32(1) and § 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1051 et seq., as amended (Lanham Act). In a civil action by the registrant of the trademark, § 32(1) makes a person liable who shall without the registrant's consent:
use in commerce a reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive....
While a trademark must be registered to be protected under § 32(1), registration is not a requirement for an action under § 43(a). General Elec. Co. v. Speicher, 676 F.Supp. 1421, 1428 (N.D.Ind.1988). Plaintiff alleges § 32(1) has been violated in that defendants have passed off their *814 product under the plaintiff's name and have deceived the public into believing that the advertisements were produced or included in the videocassette bearing Paramount's trademark with plaintiff's authority, sponsorship or consent. Passing off is the selling of one's products or services under the name or mark of another. Lamothe v. Atlantic Recording Corp., 847 F.2d 1403, 1406 (9th Cir.1988).
A registered trademark is typically infringed under § 32(1) when a similar mark is used which is likely to cause confusion in the market as to the source of the different products. Beer Nuts, 805 F.2d at 925; Polo Fashions, Inc. v. Diebolt, Inc., 634 F.Supp. 786, 788 (D.Kan.1986). The present case is unique in that the mark allegedly used is the genuine, protected trademark and not a reproduction, counterfeit, copy or imitation. Courts have recognized a § 32(1) action even where the infringer is using the actual protected trademark and not a counterfeit. E.g. Burger King Corp. v. Mason, 710 F.2d 1480, 1492 (11th Cir.1983), cert. denied 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984) ("The unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement."); Professional Golfers Ass'n v. Bankers L. & C. Co., 514 F.2d 665, 670 (5th Cir.1975). Both of these leading decisions, however, stand more accurately for the proposition that a former licensee cannot deceive the public into believing that its affiliation continues when the license has terminated. Home Box Office, Inc. v. Corinth Motel, Inc., 647 F.Supp. 1186, 1191 (N.D.Miss.1986). Without a licensing arrangement in the case sub judice, the court questions whether § 32(1) and its potential for treble damages pursuant to 15 U.S.C. § 1117(b) is appropriate. This matter need not be resolved at this stage of the litigation as § 43(a) accommodates an action based upon the identical allegations. Furthermore, a claim under either § 32(1) or § 43(a) for passing off or false designation involves the same critical factual issue  likelihood of confusion. Jordache Enterprises, Inc. v. Hogg Wyld, Ltd., 828 F.2d 1482, 1484 (10th Cir.1987).
The party claiming infringement of its trademark has the burden of proving likelihood of confusion. Id. Confusion is said to exist "when consumers make an incorrect mental association between the involved commercial products or their producers." San Francisco Arts & Athletics, Inc. v. United States Olympic Comm., 483 U.S. 522, 107 S.Ct. 2971, 2995, 97 L.Ed.2d 427 (1987) (Brennan, J., dissenting). The inquiry concerning consumer confusion does not end with the perceived source of the product but it extends to the alleged confusion which could result from a mistaken belief in common sponsorship or affiliation. Amoco Oil Co. v. Rainbow Snow, 748 F.2d 556, 558 (10th Cir.1984). The Lanham Act proscribes advertisements which mislead the public into believing that the trademark owner has sponsored, endorsed or authorized the use of the mark or that the owner is otherwise connected or affiliated with the infringer's product. See Fuji Photo Film v. Shinohara Shoji Kabushiki Kaisha, 754 F.2d 591, 596 (5th Cir.1985); Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 204-05 (2d Cir.1979); Paramount Pictures v. Dorney Park Coaster Co., 698 F.Supp. 1274, 1279 (E.D.Pa.1988). The standard for determining confusion is "whether an ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods" would be confused. Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d 934, 941 (10th Cir.1983); Avrick v. Rockmont Envelope Co., 155 F.2d 568, 572 (10th Cir.1946) ("ordinary prospective purchaser exercising due care in the circumstances"). The confusion must be shown to be probable, not merely possible. Blue Bell Bio-Medical v. Cin-Bad, Inc., 864 F.2d 1253, 1260 (9th Cir.1989).
Plaintiff's claims under the Lanham Act are built upon two types of alleged consumer confusion. First, whether an ordinary viewer of a videocassette, which was rented or purchased from a video retail store, *815 would likely believe that Paramount actually produced and recorded the defendants' advertisement. Second, whether the ordinary consumer under the same circumstances would likely believe that Paramount is connected with or has sponsored the defendants' advertisement. The shorthand reference for these two types or levels will be "production confusion" and "sponsorship confusion," respectively.
In assessing the likelihood of confusion, the Tenth Circuit has usually applied several factors, originally stated in the Restatement of Torts § 729 (1938):
"(a) the degree of similarity between the designation and the trade-mark or trade name in
(i) appearance;
(ii) pronunciation of the words used;
(iii) verbal translation of the pictures or designs involved;
(iv) suggestion;
(b) the intent of the actor in adopting the designation;
(c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;
(d) the degree of care likely to be exercised by purchasers."
Hogg Wyld, 828 F.2d at 1484 (quoting Beer Nuts, 805 F.2d at 925)). This is not an exhaustive list of relevant factors, and all are interrelated with no one factor carrying dispositive weight. Hogg Wyld, 828 F.2d at 1484. The Second Circuit developed a number of similar criteria to be applied in the situation of noncompeting products:
the strength of (plaintiff's) mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.
Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492, 495 (2d Cir.1961), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). See also Physicians Formula Cosmetics v. West Cabot Cosm., 857 F.2d 80, 83 (2d Cir.1988). The court will look to both lists in applying those factors relevant to the case at bar.
The strength or distinctiveness of plaintiff's mark is an important factor in evaluating confusion of affiliation or sponsorship. Amoco Oil v. Rainbow Snow, 809 F.2d 656, 659 (10th Cir.1987). The strength of a mark is measured in the marketplace by its tendency to identify the source of the goods even when the consumer is unaware of the source. Andy Warhol Enterprises, Inc. v. Time Inc., 700 F.Supp. 760, 765 (S.D.N.Y.1988). It is undisputed that Paramount's trademark is widely known to the public who rent or purchase videocassettes or attend movies. Because it is distinctive and used to promote plaintiff's products, plaintiff's trademark is a strong mark which suggests the production source of motion pictures and videocassettes.
The Tenth Circuit has noted that proof of an infringer's intent to pass off his goods or to select a mark for the purpose of copying the plaintiff's trademark may raise an inference of likelihood of confusion. Beer Nuts, Inc. v. Clover Club Foods Co., 711 F.2d at 941. The court must focus on whether the defendant intended to deceive the public and derive benefit from plaintiff's reputation or goodwill. Hogg Wyld, 828 F.2d at 1485; Blue Bell, 864 F.2d at 1258. Good faith is, however, not a defense to trademark infringement. Fuji Photo, 754 F.2d at 598. Paramount argues there is little question of defendants' intent in placing the advertisements "directly onto Paramount's goods" but to pass their goods off "as part of Paramount Videocassettes." (Dk. 2 at p. 15). Defendant VBS and its principals go to some length to describe their good faith, as evidenced in part by their seeking legal advice before starting up.
Plaintiff's argument for inferring defendants' intent depends upon accepting, without question, that a videocassette containing a Paramount motion picture is, in its entirety, a Paramount videocassette. For reasons explained later, this court is not willing to accept, primarily for the lack of evidence, that the public perceives the videocassette *816 purchased or rented from a video retailer to be a unit or package containing only Paramount products. Plaintiff has not presented any evidence that defendants operated under this presumption of public perception. Furthermore, defendants' actions also reasonably suggest another motive besides passing off and, that is, to advertise goods and services to captive audiences in their home. As the potential commercial advantage to such advertising was, and possibly still is, unknown, it is equally reasonable to infer that a young entrepreneur could realize this opportunity and act without having the intent of passing off the advertisements as the product of Hollywood studios.
The Tenth Circuit has consistently noted that the best evidence of a likelihood of confusion in the marketplace is actual confusion. Jordache, 828 F.2d at 1487. On the other hand, the absence of such evidence does not necessarily sustain a finding of no likelihood of confusion. Beer Nuts, 805 F.2d at 928. Evidence of actual confusion can consist of customer inquiries and public recognition surveys; the latter being more persuasive than the former. Jordache, 828 F.2d at 1487. In Beer Nuts, the district court was reversed for concluding that no likelihood of confusion existed since there was no evidence of actual confusion. The Tenth Circuit explained the lack of consumer complaints could be attributable to the products being inexpensive and nearly identical. 805 F.2d at 928.
Plaintiff has come forth with no evidence of actual confusion and no reason for this evidentiary shortcoming. Affidavits of Paramount executives stating without explanation or foundation that "the public is being misled into believing that Paramount is somehow associated with or has sanctioned defendants' unauthorized low-budget commercials" (Supplemental Declaration of Timothy Clott) is not competent, admissible evidence of actual confusion. For the same reason, Tim Mead's statement that customers are not confused about the source of the advertisements is also not proper evidence for consideration. The court considers evidence of actual confusion to be important to this case because of the largely undeveloped nature of this type of advertising, the relatively recent technological phenomenon of "VCRs" in the home, and the alleged inferior production quality of defendants' advertisements. Without such evidence, the parties are left to argue on the force of analogies to other mediums, e.g. movie theaters, books, television programs, and newspapers; all of which fail to survive any close scrutiny. Unwilling to cast about for ground upon which to anchor a decision, this court will deny a motion for preliminary injunction when the plaintiff has not sustained its evidentiary burden.
The quality of defendant's product is another factor to consider in deciding the likelihood of consumer confusion. Hogg Wyld, 828 F.2d at 1488. A difference in quality may weigh against the public being likely to confuse the products. Id. Plaintiff appears to take issue with even considering the quality of defendants' advertisements, since this would "assure every producer of cheap counterfeits of expensive products immunity from prosecution...." (Dk. 59 at p. 5). Plaintiff's slippery slope argument is flawed by the fact that the quality of a defendant's product is not a dispositive factor, but only one of several to consider. In addition, the quality of a defendant's product seems a very appropriate consideration when the alleged confusion is primarily one of affiliation or sponsorship, rather than source.
Plaintiff repeatedly tags the defendants' advertisements with such disparaging terms as "low-budget," "shoddy," "local," and "inferior." Although no party introduced into evidence an actual videocassette or played for the court a videocassette containing one of defendants' advertisements, the court will accept the plaintiff's allegations of inferior production quality as for the most part uncontroverted. With this fact, a reasonable inference is advanced by defendants that an ordinary viewer, exercising due care in the circumstances, would not perceive the defendants' advertisement for a local business as coming from the same Hollywood source as the high quality, *817 slickly produced motion picture. Plaintiff's response that the law also protects the gullible and ignorant consumers is only a general proposition and takes little away from the force of defendants' argument.
Another factor is the degree of care likely to be exercised by consumers under the circumstances. Hogg Wyld, 828 F.2d at 1487. The likelihood of confusion is less when the consumer is expected to be more discerning in the purchase of a particular item because of its nature or price. Id. Because of the lack of any evidence from the parties, this court does not believe it is in a position to speculate on the level of sophistication of a videocassette purchaser or renter. See Andy Warhol, 700 F.Supp. at 767.
The relations in use and marketing or the proximity of the products is a relevant consideration for the court. The Lanham Act does not require that plaintiff's and defendant's products be in competition. Allen v. National Video, Inc., 610 F.Supp. at 628. In applying this factor, courts have assessed whether the products are the type that the public attributes to a single source, Kingsford, 674 F.Supp. at 1430, whether the marketing techniques are similar enough to promote confusion, Amoco Oil, 809 F.2d at 663, and whether the products are marketed to the same consumers. Allen, 610 F.Supp. at 628.
This factor is the linchpin to plaintiff's position for its primary argument on confusion is that a reasonable consumer renting or purchasing a videocassette bearing a Paramount trademark could rightfully assume that what is contained in the package is produced, licensed, or at least sponsored by Paramount. By dint of this argument alone, plaintiff asserts confusion is likely.
The court considers plaintiff's argument to be overly simplistic and to subsume a number of factual issues upon which there is a dearth of evidence. First, to what extent do consumers know or understand that the actual videocassettes are owned by the video retailers? The consumer in renting or buying a videocassette contracts only with the video retailers without any mention of the videocassette producer during the transaction. Video retailers do not advertise themselves or publicly conduct their businesses as dealers or agents of certain motion picture studios. Second, do consumers believe it technologically possible for local video retailers to place advertisements on the videocassettes? Since one of the prominent selling features of VCRs is the recording of television programs onto videotapes, consumers reasonably could appreciate a video retailer having the ability to record advertisements onto pre-recorded videocassettes. Third, is it likely that consumers would believe that Paramount, a major company with a nationwide reputation, actually licensed the sale or directly sold advertising space on its videocassettes to local businesses? With these factual issues and others still outstanding and not even addressed by the parties, this court is reluctant to accept plaintiff's argument on its face that consumers would likely be misled into believing that Paramount was either the source or sponsor of the defendants' advertisements. Finally, this court is frankly skeptical that viewers actually care whether Paramount is the source or sponsor of the advertisement, since it is equally likely that consumers would attach no more significance or association to the advertisement than those that inundate them daily on television and other advertising mediums. See generally Bd. of Gov. of Univ. of N.C. v. Helpingstine, 714 F.Supp. 167, 173 (M.D.N.C.1989). For purposes of the preliminary injunction motion, the court finds that plaintiff has not sustained its burden of showing a likelihood of product confusion or sponsorship confusion.
As stated earlier, a registered trademark is not an element of a claim under § 43(a), which provides in pertinent part:
Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same and shall cause such goods or services to enter into commerce *818 ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.
While broader in scope than § 32(1), General Elec. Co. v. Speicher, 676 F.Supp. 1421, 1428 (N.D.Ind.1988), § 43(a) still has the common purpose of preventing consumer confusion regarding the source of a product. Centaur Communications, Ltd. v. A/S/M Communications, Inc., 830 F.2d 1217, 1220 (2d Cir.1987). The elements to a § 43(a) violation are: "(1) defendant used a symbol falsely describing an article; (2) defendant caused such article to enter into commerce; and (3) plaintiff was damaged by the use of such false description," and (4) the description or representation is likely to confuse consumers. Polo Fashions, 634 F.Supp. at 789-90. The likelihood of confusion test discussed in § 32(1) is the same one used for a § 43(a) claim. Amoco Oil, 748 F.2d at 558. Consequently, the court's decision on the confusion element to plaintiff's § 32(1) claim also applies to plaintiff's § 43(a) claim for false designation of origin.
Plaintiff also claims a § 43(a) violation for alteration or mutilation of videocassettes bearing Paramount's trademark, since defendants' advertisements "randomly overlap and obliterate pre-recorded material...." (Dk. 2 at p. 21). The court has reviewed the case law supporting such a claim and finds it readily distinguishable from the case at bar.
The first decision cited by Paramount is Granz v. Harris, 198 F.2d 585 (2d Cir. 1952), which involved the defendant's re-recording of master recordings for later sale as the work and presentation of plaintiff, a well-known promoter and producer of jazz concerts. The defendant purchased the master and re-recorded it at the same speed onto a smaller record thereby deleting a portion of the original musical production. Because the sales contract required defendant to use the legend attributing the work to plaintiff, the Second Circuit held it would be unfair competition or false representation to sale an abbreviated record. The Second Circuit noted that the re-recording deleted over eight minutes of various instrumental solos and was described by one expert witness as disturbing the "whole musical effect" of the master recording. The expert also observed that the start of the second side of the copy did not take up where the other side left off.
The other decision cited by Paramount in support of its mutilation claim is Gilliam v. American Broadcasting Companies, Inc., 538 F.2d 14 (2d Cir.1976), in which the plaintiffs, a group of writers and performers known as "Monty Python," sought to enjoin defendant, American Broadcasting Companies, Inc. (ABC), from broadcasting edited versions of three separate programs they originally wrote and performed for British television. ABC obtained the broadcasting rights to several of plaintiffs' programs, and the plaintiffs expected that ABC would televise the three thirty-minute programs in their entirety. Instead, ABC omitted over one-fourth of the programs during the ninety minute special for commercials and other editing of offensive or obscene material. Among the viable legal theories asserted by the plaintiffs, the Second Circuit recognized a § 43(a) claim on the following grounds:
These cases cannot be distinguished from the situation in which a television network broadcasts a program properly designated as having been written and performed by a group, but which has been edited, without the writer's consent, into a form that departs substantially from the original work. "To deform his work is to present him to the public as the creator of a work not his own, and thus makes him subject to criticism for work he has not done." Roeder, supra, at 569 (Roeder, The Doctrine of Moral Right, 53 Harv.L.Rev. 554 (1940)). In such a case, it is the writer or performer, rather than the network, who suffers the consequences of the mutilation, for the public will have only the final product by which to evaluate the work. Thus, an allegation that a defendant has presented to the public a "garbled," Granz v. Harris, supra (Frank, J., concurring), distorted version of plaintiff's work seeks to redress the very rights sought to be protected *819 by the Lanham Act, 15 U.S.C. § 1125(a), and should be recognized as stating a cause of action under that statute. (citations and footnote omitted).
538 F.2d at 24-25. The Second Circuit viewed the edited version and found that at times it "omitted the climax of the skits to which appellants' (plaintiffs') rare brand of humor was leading and at other times deleted essential elements in the schematic development of a story line." 538 F.2d at 25 (footnote omitted). Because these changes misrepresented to the public the plaintiffs' work and compromised its quality, the Second Circuit issued the preliminary injunction.
The occasional overlapping of defendants' advertisements onto the FBI warning or plaintiff's advertisements can hardly be compared to the substantial and material alterations described in Granz and Gilliam. Whatever pre-recorded material that is overlapped or distorted is not represented or advertised to be the work of Paramount. Viewers are not informed by the outside of the videocassette that it includes a Pepsi commercial or previews of upcoming releases. What is represented to be the work of Paramount, the recorded motion picture, is not altered, mutilated, edited, or changed in any manner by defendants' advertisements. The court does not perceive a substantial likelihood of plaintiff's success on this claim, as well as the other trademark/unfair competition claims.

Copyright
There are two basic elements to a claim for copyright infringement: (1) plaintiff's ownership of the copyright; and (2) defendant's "copying" of the work protected by copyright. Nelson v. PRN Productions, Inc., 873 F.2d 1141, 1142 (8th Cir.1989); Southwestern Bell Media v. Trans Western Pub., Inc., 670 F.Supp. 899, 905 (D.Kan.1987). It is undisputed that Paramount is the registered owner of the copyrights to the various motion pictures. What remains is the relatively simple issue of whether defendants copied plaintiff's motion pictures.
"Copying" is the shorthand reference to the act of infringing any of the copyright owner's five exclusive rights set forth at 17 U.S.C. § 106. S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081 (9th Cir.1989) (1989 U.S.App.Lexis 13767). See also 2 M. Nimmer, Nimmer on Copyright § 8.01[A] (1989). Stated another way, a copyright is infringed when any of the exclusive rights of the copyright owner as provided in § 106 are violated. 17 U.S.C. § 501(a). Plaintiff's copyright claims are based upon a moral right and the following two statutory rights: "to prepare derivative works based upon the copyrighted work;" and "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;...." 17 U.S.C. § 106(2) and (3).
As one of its copyright claims, plaintiff alleges that defendants' addition of the unauthorized advertisements constitutes unauthorized editing of a copyrighted work and, therefore, a copyright infringement. Plaintiff does not ground this claim on the infringement of any right found in 17 U.S.C. § 106, and instead relies upon the following decisions. WGN Continental Broadcasting Co. v. United Video, 693 F.2d 622 (7th Cir.1982); Gilliam, 538 F.2d at 20-22; National Bank of Commerce v. Shaklee Corp., 503 F.Supp. 533 (W.D.Tex. 1980). A leading commentator on copyright law discusses these three decisions under a topic he labels moral rights of a copyright owner. 2 Nimmer § 8.21[C][1]. Nimmer prefaces his discussion of this body of case law by noting that the Copyright Act does not expressly recognize moral rights and that American courts have been slow to develop them. Id. Aware of the role and stature of these decisions in the general field of copyright law, this court is reluctant to extend their holdings beyond their controlling facts. The court considers its approach appropriate, since the Supreme Court has stated that a person does not infringe a copyright when he makes an unauthorized use of the protected work but in a manner outside the scope of any of the copyright holder's exclusive rights. Twentieth Century Corp. v. Ai- *820 ken, 422 U.S. 151, 155, 95 S.Ct. 2040, 2043, 45 L.Ed.2d 84 (1975).
Plaintiff WGN was an unaffiliated television station that used an intermediate satellite carrier operated by United Video to pick up WGN's broadcast signals and transmit them to cable systems. 693 F.2d at 624. WGN was experimenting with the carrying of material or "teletext" during the vertical blanking interval, which is that period or interval in which the electron gun on the viewer's television is shut off and returns to the top of the screen for the generation of the next image. Defendant did not retransmit WGN's teletext and instead substituted teletext supplied by another customer. In deciding whether WGN's copyright on the television program included the teletext in the vertical blanking period, the Seventh Circuit began with considering the Copyright Act's definition of "audiovisual work" as "a series of related images which are intrinsically intended to be shown by the use of machines...." 17 U.S.C. § 101. United Video conceded that WGN's copyright for the program also covered the teletext as one of its related images. The Seventh Circuit, nevertheless, stated in dicta that even if the blanking intervals were not used by WGN that United Video could not use them without WGN's permission, citing the Shaklee case as authority. 693 F.2d at 626. The Seventh Circuit offered no reasoning for this statement other than the analogy of a book publisher leaving the inside pages blank and the book seller placing the Lord's Prayer on them to increase sales. Id. What is significant is that the court did not say that the unused blanking intervals were "related images which are intrinsically intended to be shown ..."
Nimmer writes that the Gilliam decision is the first time that an author's right to prevent his work from being distorted or truncated achieved "full copyright status." 2 Nimmer § 8.21[C] at pp. 8-257  8-258. The relevant facts of the Gilliam case were discussed earlier. The pertinent ruling of the Second Circuit is that a licensee infringes a copyright where it publishes the protected work after making extensive, unauthorized changes which impair the integrity of the original work. 583 F.2d at 20-21. This court has already observed that the significant editing changes made by ABC to the "Monty Python" programs far exceed in scope and effect the defendants' addition of a local advertisement to the front of a videocassette.
The case of National Bank of Commerce v. Shaklee Corp. involved a book written by Heloise, a newspaper columnist, who wrote about household hints and also collected them for her books. During her career, Heloise never endorsed a specific product and maintained a policy of referring to all products by their generic name. Shaklee contracted with Benjamin Company, owner of the paperback publishing rights of Heloise's books, to purchase a number of Heloise's books adapting them into a special Shaklee edition. Among the changes, the front cover identified it as a special edition and the back cover outlined the categories of Shaklee products. Scattered throughout the inside of the book were sixteen advertisements for Shaklee products, including advertisements at the end of each chapter. All of these changes were made without the consent of Heloise. Because there was "very little authority relevant to the question whether Shaklee's addition of advertisements to the printed text of Heloise's book constitutes copyright infringement," the district court of Texas relied upon the reasoning in Gilliam in finding an infringement. 503 F.Supp. at 543-44.
This court is not persuaded that the case sub judice comes within the circumstances and teachings of these three decisions. Paramount does not allege that defendants were granted certain rights in the motion pictures which they exceeded or abused. This is not a case where the substance of the protected work is significantly altered and its quality and integrity compromised by a licensee or grantee who oversteps his authority. This is not a case where the equities so obviously favor the copyright owner that the court must struggle with the notion of "moral rights." What emerged in Gilliam, was applied in Shaklee, and later noted in dicta of WGN *821 is the right to check distortion or truncation of a copyrighted work. This court is not satisfied that the result of defendants' addition is the distortion of plaintiff's motion picture.
Plaintiff next claims that by adding the advertisements to the videocassette the defendants have created unauthorized derivative works. The Copyright Act defines a derivative work as:
[A] work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".
17 U.S.C. § 101. "[A] work will be considered a derivative work only if it would be considered an infringing work if the material which it has derived from a preexisting work had been taken without the consent of a copyright proprietor of such preexisting work." 1 Nimmer § 3.01 at p. 3-3 (1988). The plaintiff has not presented any authority to support the conclusion that the mere addition of a commercial to the front of a videocassette recasts, transforms, or adapts the motion picture into what could represent an "original work of authorship."
The instant case does not resemble in any way the removing of a page from an artwork book and mounting it onto a tile as a separate piece of art for sale. Mirage Editions, Inc. v. Albuquerque A.R.T. Co., 856 F.2d 1341, 1342-43 (9th Cir.1988), cert. denied, ___ U.S. ___, 109 S.Ct. 1135, 103 L.Ed.2d 196 (1989). Nor can the court appreciate any comparison to the decision of Midway Mfg. Co. v. Artic Intern., Inc., 704 F.2d 1009 (7th Cir.), cert. denied, 464 U.S. 823, 104 S.Ct. 90, 78 L.Ed.2d 98 (1983), where the court held that defendant's circuit board which speeded up the play of plaintiff's video game was a derivative work, because it was a "substantially different product from the original game" in making the game more challenging and exciting. In both cases, the derivative work transformed, adapted or recast the original work into a new and different one. "A derivative work consists of a contribution of original material to a pre-existing work so as to recast, transform or adapt the pre-existing work." 1 Nimmer § 3.03 (1988). While defendants' advertisement is an original work, the court does not recognize the addition of it to a videocassette in any way recasting, transforming or adapting the motion picture. The result is not a new version of the motion picture.
Plaintiff's final copyright claim is the unlawful distribution of mutilated versions or derivative works. This claim depends upon the success of either of the prior two claims regarding mutilation of a copyrighted work or the preparation of a derivative work. Since the court has found little likelihood of success on both of these claims, the distribution claim also fails to carry the day. Furthermore, in the absence of a derivative work, the plaintiff's distribution claim is barred by the first sale doctrine which provides that when "a copyright owner parts with title to a particular copy of his copyrighted work, he divests himself of his exclusive right to vend that particular copy." Mirage Editions, 856 F.2d at 1344 (quoting United States v. Wise, 550 F.2d 1180, 1187 (9th Cir.1977). Plaintiff has not shown a substantial likelihood of success on any of its copyright claims.

State Common Law
The court's conclusions on plaintiff's § 43(a) claims are equally applicable and binding on plaintiff's state law claims of unfair competition for passing off and adulteration. See Polo Fashions, 634 F.Supp. at 790. For that reason, the court need only consider under this section the plaintiff's claim for tortious interference with prospective business advantage.
Kansas recognizes the tort of interference with prospective business advantage as having the following elements of proof:

*822 "(1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct."
Noller v. General Motors Corp., 244 Kan. 612, 620, 772 P.2d 271 (1989) (quoting Maxwell v. Southwest Nat. Bank, Wichita, Kan., 593 F.Supp. 250, 253 (D.Kan.1984)). This tort arises when a party improperly interferes with a third person's prospective business advantage by either "`inducing or otherwise causing a third person not to enter into or continue the prospective relation or ... preventing the other (party) from acquiring or continuing the prospective relation.'" Noller, 244 Kan. at 620, 772 P.2d 271 (quoting Restatement (Second) of Torts § 766B (1977)).
Plaintiff argues that defendants' advertisements "seriously jeopardize plaintiff's reasonable expectations" that Pepsi and other national companies would contract with it for advertisements on future videocassettes. Plaintiff explains that it can no longer assure potential advertisers that their advertisements will be the only ones featured on a videocassette or will even remain on the videocassette after it is sold. There are some critical gaps to plaintiff's claim which prevent this court from finding that there is a substantial likelihood of its success. The court cannot infer malicious conduct on the part of defendants by the mere fact that they knew of the Pepsi commercials, since other lawful motives can be readily ascribed to their actions as the court has previously noted. The placement of advertisements on videocassettes owned by the video retailer has not been shown to be a wrongful or improper means of competition. On the scant evidence of record, the court cannot grant plaintiff's motion on the basis of this claim. While the plaintiff's failure to sustain its burden on any one of the required elements of proof for a preliminary injunction is sufficient to deny its motion, the court will briefly address two of the other elements.

IRREPARABLE HARM
For purposes of a preliminary injunction, a presumption of irreparable injury or harm is presumed upon showing a trademark or copyright infringement. Amoco Oil, 809 F.2d at 663-64; New Line Cinema Corp. v. Bertlesman Music Group, 693 F.Supp. 1517, 1521 (S.D.N.Y. 1988). The presumption is undercut when the plaintiff has delayed seeking injunctive relief. GTE Corp. v. Williams, 731 F.2d at 678. This rule is simply explained as averting the incongruity of allowing a plaintiff to rest on its rights yet later request and obtain swift and immediate relief from the court. Kusan, Inc. v. Alpha Distributors, Inc., 693 F.Supp. 1372, 1374 (D.Conn.1988).
Delay is measured from when plaintiff has, or should have, knowledge of the infringement. GTE Corp. v. Williams, 731 F.2d at 678-79 (quoting J. Gilson, Trademark Protection and Practice § 8.07[1] (1984)). Contra Nabisco Brands Inc. v. Conusa Corp., 722 F.Supp. 1287, 11 U.S.P.Q.2d 1788 (M.D.N.C.1989). The court has reviewed the letters between the plaintiff and defendants beginning with plaintiff's letter of May 12, 1988, wherein Paramount stated:
We recently received information that Video Broadcasting Systems, Inc. ("VBS") has engaged or intends to engage in a business of placing its clients' commercial advertisements onto pre-recorded videocassettes containing motion picture programs for a fee. These "edited" pre-recorded videocassettes are then rented or otherwise distributed by video retail outlets. We understand that certain of the videocassettes onto which you intend to place or have placed commercial advertisements are videocassettes containing Paramount Pictures Corporation's ("Paramount") motion picture programs.
Paramount also requested that VBS cease and desist with its business activities as to *823 any videocassettes of Paramount motion pictures. Defendant responded by letter dated May 27, 1988, that it had commenced business and had "already committed a large sum for its commercial production...." Based on these representations, plaintiff should have investigated defendants' activities and commenced this action within two or three months of the May 27th letter, instead of waiting until May 12, 1989, to hire an investigator and several more months August 3, 1989, to file suit. Because its delay in bringing suit was inordinate, plaintiff is in no position to complain of the delay required before it obtains any of the final relief to which it may be entitled. GTE Corp., 731 F.2d at 679. See also Kingsford Products, 674 F.Supp. at 1431 (Delay of eight months suggests no irreparable injury).

BALANCE OF HARDSHIPS
A preliminary injunction would cause a substantial hardship to defendants. The injunction would preclude VBS from conducting its primary business of selling and recording advertisements onto the blank lead-in tape of pre-recorded videocassettes. Plaintiff counters with the presumption of irreparable harm done to its reputation and good will. The court finds the defendants would suffer more from the injunction. Furthermore, the plaintiff's presumption of harm is diluted by its failure to name as parties to the suit the other eighteen video retailers in Wichita who also carry videocassettes containing defendants' advertisements.
In light of these rulings, it is unnecessary to address the element of public interest. The court holds that plaintiff has not shown a substantial likelihood of success on the merits of its claims. The court also holds that plaintiff's delay in bringing suit disarmed any presumption of irreparable harm and tipped the balance of hardships towards the defendants. For these reasons, the court denies the plaintiff's motion for preliminary injunction.

DOMINO'S MOTION TO DISMISS
Domino's Pizza, Inc. (DPI) seeks to dismiss plaintiff's complaint for failure to allege any wrongful acts or omissions by DPI. In the alternative, DPI moves for summary judgment on the strength of an affidavit from its director of national advertising that DPI "did not formulate, develop, produce, conduct or participate in any manner in the" advertising described in plaintiff's complaint and that the Domino's stores identified in plaintiff's complaint are franchise stores owned and operated by independent contractors. Plaintiff responds that DPI benefits from the unauthorized advertisements and through its franchisees has engaged in the alleged activities. Plaintiff then attempts to develop a theory of vicarious liability against DPI on the basis that franchisors or licensors may have the statutory and contractual authority to control the use of their trademarks in advertising. Paramount finally argues it should be allowed the opportunity to conduct discovery regarding the franchise relationship between DPI and the subject franchisees in an effort to determine DPI's liability for placement of the advertisements.
A motion to dismiss under Fed.R.Civ.P. 12(b)(6) will be granted if it appears without doubt that plaintiff can prove no set of facts in support of its claim to entitle it to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-02, 2 L.Ed.2d 80 (1957). Plaintiff alleges that the defendant advertisers, including DPI, owned or paid VBS to produce unauthorized advertisements and also paid VBS to insert the advertisements upon the videocassettes. While not worthy of being called well-pleaded facts, these allegations are enough to escape the granting of a 12(b)(6) motion.
Alternatively treating DPI's motion as one for summary judgment, DPI's affidavit clearly shows that it directly or personally committed none of the alleged activities. Plaintiff also does not aver discovery would show that DPI personally participated in the placement of the unauthorized advertisements. Fed.R.Civ.P. 56(f). Even though the court does not understand plaintiff's cited legal authority to hold, in particular, that a franchisor is vicariously liable for a franchisee's advertisements *824 containing the franchisor's trademarks when the franchisor did not approve, authorize, or even have knowledge of the particular advertisements, the court will delay its decision on this matter until discovery is conducted regarding it or until another order is entered modifying this one. See Fed.R.Civ.P. 56(f). For the same reason, the court will await further discovery in deciding whether DPI is a contributory infringer under the Copyright Act.
IT IS THEREFORE ORDERED that plaintiff's motion for a preliminary injunction is denied;
IT IS FURTHER ORDERED that plaintiff's motion to strike portions of defendants' affidavits is granted in part;
IT IS FURTHER ORDERED that Domino's motion to dismiss and, in the alternative, for summary judgment is denied.