FINANCIAL CONTROL ASSOCIATES, INC., Plaintiff,

v.

EQUITY BUILDERS, INC., Robert V. Bundy, Benjamin F. Blair and Dave Anderson, Defendants.

No. 92–4192–C.

United States District Court, D. Kansas.

Sept. 1, 1992.

David A. Hanson, Glenn, Cornish, Hanson & Karns, Chtd., Topeka, Kan., Wendell R. Bird, David J. Myers, Timothy W. Townsend, Bird & Associates, Atlanta, Ga., for plaintiff.

Don M. Bradley, Michael B. Hurd, Shook, Hardy & Bacon, Kansas City, Mo., Jeffrey S. Nelson, Shook, Hardy & Bacon, Overland Park, Kan., for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

On August 10, 1992, Financial Control Associates, Inc., (FCA) filed its complaint alleging violation of its copyright on the "Mortgage Controller" by Equity Builders, Inc., Robert V. Bundy, Benjamin F. Blair, and Dave Anderson.[1] The defendants produce a product called the "Equity Builders." The purpose of both products is to provide a system for prepayment of mortgages. The underlying premise of both products is the idea that early payment of principal will result in substantial savings in the total amount of interest to be paid.[2]

According to the plaintiff's complaint, the defendants have blatantly copied its product in violation of 17 U.S.C. § 106(1)

---

1. Approximately five hours earlier, the defendant, Equity Builder, Inc., filed a complaint for declaratory judgment in Case No. 92–4190–S, naming Financial Control Associates, Inc., as the defendant. On August 11, 1992, Case No. 92–4190–C was transferred by minute order from the Honorable Dale E. Saffels, to this court. That case now bears Case No. 92–4190–C.

2. To briefly explain the products, the purchaser of the product supplies certain information to the manufacturer (original amount of loan, first payment due date, current principal balance, interest rate, term of the loan, and account number; *see* Defendant's Exhibits #'s 4 and 5). From that information a booklet containing schedules of prepayments is generated to specifically fit the purchaser's mortgage. Each product includes a method by which to record prepayments. Notices or coupons are also included in each product which are to be sent to the lender with each prepayment. The notices or coupons inform the lender of the purpose of the payment.

The products are described in considerable more detail in the body of this opinion.

and have prepared a derivative work based upon the Mortgage Controller in violation of 17 U.S.C. § 106(2). The plaintiff also alleges a cause of action for deceptive trade practices and a cause of action for unfair competition. The complaint seeks declaratory relief, injunctive relief, an order impounding and destroying all copies of the Equity Builders, actual damages and wrongful profits, attorneys' fees, and pre-judgment and post-judgment interest.

This case comes before the court upon the plaintiff's application for a preliminary injunction against the defendants for alleged copyright infringement, unfair competition and deceptive trade practices. On August 20, 1992, the court conducted an evidentiary hearing on the plaintiff's application. At the hearing, each party was afforded an opportunity to make an opening statement, present evidence, cross-examine witnesses and make closing remarks.[3] Although the court offered the parties an additional opportunity to brief the issues presented by this application for a preliminary injunction, the parties ultimately declined that invitation, indicating that they would prefer an expedient decision from the court rather than taking advantage of an additional opportunity to submit additional argument and authority to the court.

Having considered the evidence presented, the briefs and arguments of counsel and the applicable law, the court denies FCA's motion for a preliminary injunction. This order constitutes the court's findings of fact and conclusions of law.

### Arguments of the Parties

On page three of its complaint, FCA *concedes* that the "idea of a system for prepaying mortgages is not copyrightable, 17 U.S.C. § 102(b), but the particular words or expression of the idea and of the instructions and examples are copyrightable." FCA contends that "[i]n addition to copying the idea of the Mortgage Controller, the Equity Builders copies the expression or manner of presentation first employed in the Mortgage Controller and is substantially similar to the Mortgage Controller. Spe-

cifically, FCA contends that the Equity Builders is similar to its Mortgage Controller in several ways. These are *some* of the examples of similarities between the two products identified by the plaintiff:

(1) The Equity Builders is contained in an embossed vinyl notebook-style binder that is exactly the same size as the Mortgage Controller's binder (both use 8½ by 11" paper);

(2) Same information on first page of both products; information presented in columnar fashion;

(3) Use of plastic tabs to separate sections similar;

(4) Use of similar titles and example tables;

(5) Similar section on how to use each product;

(6) Similar phrases explaining the ease of use and value of the product;

(7) Equity Builders' table captioned "Projected Investment Results," like the Mortgage Controller's table "Specific Investment Results," utilizes a concise, easy to use columnar table format containing same categories: interest savings, equity build-up, term reduction, interest deductions, and average monthly "investment." Similarly, the Equity Builders' "Annual Flexible Payment Table" contains the same categories that the Mortgage Controller's "Earning Power Table" contains; both use the same convenient columnar table format.

(8) Instructions for use of the products is similar.

(9) Record pages for both products is similar.

(10) Lender notices of the products are the same "convenient" size, correspond to prepayments, contain spaces with almost identical prerecorded information for the prepayment to be made, and employ very similar language.

(11) Other general similarities.

The plaintiff contends that Bundy and Blair, former sales associates of FCA, have purchased and received the Mortgage Controller, as demonstrated by shipping invoic-

---

**3.** Prior to that hearing, each party submitted a     brief in support of their respective positions.

es, and have demonstrated copies of the Mortgage Controller and have sold the Mortgage Controller to others. Through Bundy and Blair, Equity and Anderson had access to the Mortgage Controller. Equity, Anderson and Bundy have distributed the Equity Builders to the public.

The plaintiff indicates that Equity and/or Bundy may not have sufficient resources to adequately cover any damages ultimately assessed, after the damage has been done. The plaintiff also argues that it has also demonstrated a substantial likelihood of success upon the merits of its claims under Kansas common law for deceptive trade practices and unfair competition.

In FCA's memorandum in support of its motion for a preliminary injunction, FCA argues that the defendants have violated its copyright by copying the manner of expressing the idea of mortgage prepayment. Specifically, the plaintiff contends that the arrangement of words and the arrangement of mortgage prepayment information is protected by copyright. The plaintiff argues that although the defendants have attempted to disguise their copyrighting, the defendants' product is substantially similar and violative of its copyright.

As to the requirements of a preliminary injunction, the plaintiff argues that it has established all four criteria. On the issue of irreparable harm, plaintiff argues that in the context of copyright infringement, irreparable harm and absence of an adequate remedy are presumed. FCA argues that because the Equity Builders is lower in price, buyers will naturally purchase that product over its Mortgage Controller. FCA associates selling the Mortgage Controller will be reluctant to sell the higher-priced product. Similarly, the plaintiff contends that its competitive market position will be damaged and that assessing actual damages will be difficult. The plaintiffs also argue that the defendants will probably not be able to pay those damages as defendants may possess inadequate resources.

The plaintiff also argues that it has demonstrated substantial likelihood of success upon its claims under Kansas common law for deceptive trade practices and unfair competition. As to the deceptive trade practice claim, the plaintiff points to one FCA associate's confusion about the source of the Equity Builders. As to the unfair competition practices, the plaintiff argues that the sale of the Equity Builders appropriates its property and that allowing the defendants to continue to sell their product will result in unfairness and economic harm. FCA dedicates approximately one page of its brief to these issues.

On August 18, 1992, the defendants filed their response to the plaintiff's motion for a preliminary injunction. While the defendants address each of the criteria to be considered in determining whether a preliminary injunction is appropriate, the defendants primarily contend that the plaintiffs cannot demonstrate a likelihood of success. Specifically, the defendants contend that they have not copied *protectable elements* of the Mortgage Controller.

The defendants *concede* that they had access to FCA's mortgage controller booklet and that the Equity Builders conveys the mortgage prepayment idea. The defendants, however, deny that they have copied any portion of the Mortgage Controller which was capable of copyright protection and that the similarity between the two products is so because of the function which they provide.

The defendants contend that the idea of mortgage prepayment is not protectable. The plaintiff has conceded this point, but argue that its expression of the idea is protected by copyright. The defendants deny that they have copied some *protectable expression* of the idea of the Mortgage Controller.

Specifically, the defendants contend that the Mortgage Controller consists in large part of tables and charts recording financial data determined from amortization programs. The defendants argue that the tables and charts themselves are unprotectable because blank forms are not proper subjects for copyright protection. The defendants argue that the blank form analysis does not change simply because the

forms contain numbers generated on amortization principles.

The defendants also argue that when ideas are subject to expression in only a limited number of ways, the expression itself is not protected because it merges with the idea. The defendants also suggest that the similarities between their product and the Mortgage Controller is inevitable or trivial.

As to the issue of irreparable injury, the defendants argue that no presumption of irreparable harm should be found given the substantial issues that they have raised as to the merits of the plaintiff's case. The defendants also argue that FCA's delay in bringing suit should rebut the presumption of irreparable harm. The defendants do not indicate exactly what period of time they are claiming is an indication of delay.[4]

As to the balance of harms, the defendants indicate that they have invested their personal savings into this "fledgling business." If a preliminary injunction is entered, their business will be destroyed and their ability to raise capital will be crippled. The defendants argue that the injunction would be the death knell of their business, but in comparison would have no significant impact on the national marketing of FCA's product.

As to the issue of public interest, the defendants argue that the public interest is served by open, fair and free competition. The defendants argue that the plaintiff is not attempting to recoup its investment costs, but instead preserve its ability to charge excessive prices to consumers primarily because of FCA's multi-layer commission structure.

In regard to the issue of deceptive trade practices, the defendants argue that one instance of an FCA's sales associate momentarily mistaking the Equity Builders' flyer is insufficient evidence that the public would be misled by this product. As to the issue of unfair competition, the defendants argue that there can be no confusion between the Equity Builders and the Mortgage Controller as the Equity Builders prominently displays its trademark, as does the Mortgage Controller. The defendants argue that the case cited by the plaintiff, *Parsons Mobile Products, Inc. v. Remmert*, 216 Kan. 256, 531 P.2d 428 (1975), is distinguishable as the court in that case stated that selling a competing product without distinguishing marks may in limited circumstances constitute unfair competition.

In the event a copyright would be granted, the defendants note the requirement for a bond.

### Findings of Fact

The plaintiff, FCA, is a Florida Corporation. As for the defendants, Equity is a Kansas corporation. Robert Bundy, a Kansas resident, is the president of Equity. Benjamin Blair, a Kansas resident, is the vice-president of Equity. Dave Anderson, a Kansas resident, is the Regional Sales Manager for Equity.[5]

FCA owns a copyright on its product the Mortgage Controller. The copyright is registered with the United States Copyright Office. The Mortgage Controller bears FCA's copyright notice. The Equity Builders also bears a copyright notice.

FCA's product, Mortgage Controller, which is sold though a multi-level marketing organization,[6] sells for approximately $200. In comparison, Equity Builders is sold directly to consumers for $99.25 and at wholesale for $49.25. The difference in price is, at least in part, the result of the commission paid to Mortgage Controller

---

4. Part of the delay may be due to the plaintiff's attempt to negotiate an amicable resolution of this dispute out of court, which is difficult to characterize as delay. *See* Equity Builders' complaint in Case No. 92–4190, Exhibits B and C. This argument, however, was not expressly made by FCA.

5. The plaintiffs allege that each of the human defendants has at times acted as individuals at some relevant times.

6. An affidavit from Bundy indicates that FCA's multi-level marketing method "is structured like a pyramid method but in a legal fashion."

sales associates, which can be as much as $152 per sale.[7]

The Mortgage Controller is presented in a green vinyl cover. The cover is lined with green velvet material. On the front of the cover is a gold etching of the "Liberty Bell" and the words "DEDICATED TO LIVING DEBT FREE." The Mortgage Controller is printed on 8½ by 11 inch paper. Tabs divide the Mortgage Controller into six sections. A separate page titled "How To Use This System" is also included with the product. That sheet instructs the user to request certain information from the purchaser's lender and then, taking that information, to begin using the Mortgage Controller. The sections of the Mortgage Controller are titled: Why The Controller; Using The Controller; Earning Power Table; Personal Control Sheet; Lender Notices.

The first substantive page of the Mortgage Controller is personalized to the purchaser's mortgage. FCA's copyright notice appears at the bottom of that page. The second page is "The Mortgage Controller Guarantee." FCA guarantees that "[i]f any data is not correct, your Mortgage Controller will be corrected and replaced right away, free of any cost to you."

The section "Why The Controller" begins with a quotation from Benjamin Franklin in 1753: " 'Tis against some Men's Principle to pay interest, and seems against others' interest to pay the Principal." The balance of the page suggests that the Mortgage Controller is a unique product "designed to eliminate debt and motivate people to live debt free." The text suggests that the product is easy to follow and that it contains all of the information and forms

> necessary for you to start taking advantage of the 'secret' benefits of home ownership. Use it ... and begin experiencing the sense of *freedom* and the feeling of *security* it produces as you take *control* and progress toward living debt-free. The system is customized and tailored specifically to your mortgage. Not

only is it simple to understand and fun to use, it has the total flexibility necessary to meet the financial squeeze of today's homeowner, therefore becoming a powerful investment tool.

The next page indicates that the Mortgage Controller provides *F*reedom, *C*ontrol and *A*ssurance. The following page provides a specific example demonstrating the economic advantages of prepayment.

The next section, "Using The Controller," indicates that using the product is as "Easy As A-B-C" and explains the purposes of the Personal Control Sheet and the Lender Notices. The text also instructs the user to "[m]ake your regular payment *WITHOUT FAIL*. Once your regular payment is made, you are free to make prepayments." The following page states "READY-SET-GO" and details the steps necessary to use the Mortgage Controller. As regular payments are made, the user is instructed to place a sticker entitled " 'Tis against some men's principle to pay interest" over the prepayment box opposite the payment notation. After determining the amount of money that can be allocated to prepayment, the user is instructed to make as many prepayments as the money allocated will cover and place a sticker entitled "Dedicated to Living Debt-Free" over the regular monthly payment box(es) opposite the prepayment boxes. Next, the user is instructed to remove the lender notices that match the prepayments and send the lender a separate check along with each lender notice when a regular payment is made. An example of the use of the product is attached to this memorandum and order marked "Exhibit A."

The next section, "Earning Power Table," posits certain hypothetical questions and then highlights the answer on the next page. That page contains nine columns. The columns are titled: Yr. No.; Payment No.; Annual Payment Amount; Annual Principal Amount; Total Payment Amount;

---

**7.** FCA argued that $200 price is used to pay for development of the Mortgage Controller and an ongoing support staff. No direct evidence establishing these costs, other than testimony regarding the existence of a support staff, was presented at the evidentiary hearing by FCA. The court has not considered the supplementary affidavit filed by FCA as it was not admitted during the hearing.

Total Interest Paid; Total Principal Paid; Loan Balance; Equity Build–Up.

The next section, the Personal Control-sheet, contains 30 pages which contain information pertinent to tracking the prepayment of a thirty year mortgage. Each page consists of six columns. The columns are headed: Starting Date; Regular Monthly Payments; Principal Payments; Interest Savings; Loan Balance; Equity Build–Up.

The final section, Lender Notices, are essentially coupons. The attached "Exhibit A" is an example of one such coupon.

The words "Mortgage Controller" and the Liberty Bell symbol appear throughout the product.

In comparison, the Equity Builders is presented in red vinyl cover.[8] Embossed in gold on the front of the cover is an eagle standing over the name of "Equity Builders." The Equity Builders is printed on 8½ by 11 inch paper.[9] Sections within the binder are separated by tabs. These sections of the Equity Builders are titled: 5 Year Example; Getting Started; How to Use; Personal Payment Plan; Lender Coupons.

The first page of the product is personalized to the purchaser and lists information relevant to that person's mortgage. The first page includes a "statement of accuracy," indicating that the calculations are accurate, and if not, that Equity Builders will replace incorrect pages at any time at no cost. The next page of the Equity Builders, titled "Why Should I Prepay My Home Mortgage?," explains the advantages of prepayment. The text also explains the basic steps involved in using the product. One sentence suggests that "It's easy!" At the bottom of the page are the sentences: "We want you to be one who retires financially independent! *Building Wealth by Decreasing Debt!*" On the next page is a drawing of a hand holding a magnifying glass. The page is titled "Take a Closer Look." The text suggests an ex-ample in which a person could pay off a thirty-year mortgage ten years early and then invest the amounts that otherwise would have been paid toward the mortgage. The result is early retirement of the mortgage and also the establishment of a "nest egg."

The section titled "5 Year Example" provides a specific example of the advantages of making one prepayment per month. The next page explains the advantages of making 12 or more monthly payments at one time. On the following page is an "ANNUAL FLEXIBLE PAYMENT TABLE." The columns in that table are titled: Year No.; Payment Number; Annual Payment; Annual Interest; Annual Principal; Cumulative Payment; Cumulative Interest; Cumulative Principal; Loan Balance; Equity Buildup.

The section titled "Getting Started" instructs the user how to use the Equity Builders if the loan is new or if the loan is one in which one or more payments have already been made. The section titled "How To Use" explains how to use the Equity Builders and includes an example of how the product could be used and the benefits associated with making certain prepayments.

The section titled "Personal Payment Plan" contains a prepayment plan for a person with a thirty year mortgage. On each page is a plan for each year. Each page contains six columns. The columns have the following headings: Payment Number; Regular Payment; Prepayments; Interest Savings; Equity Account; Loan Balance. At the bottom of the page are blank lines for "Total Months Prepaid," "This Year Paid Off By" and "Total Interest Saved By Prepayments." Unlike the Mortgage Controller, which uses stickers as means of tracking payments, the Equity Builders instructs the user to cross-out appropriate boxes.

---

**8.** The defendants conceded that the Mortgage Controller has a cover of better quality.

**9.** Bundy chose that paper size because it is the standard size of paper commonly used. The court notes that this opinion is printed on that same size of paper.

In the final section are Lender Coupons. The attached "Exhibit B" is an example of the coupons found in that section.

Equity Builders' mark (the eagle over the words "Equity Builders") appears repeatedly throughout the product.

On June 21, 1992, an ad for the Builders appeared in the real estate section of a Topeka newspaper. On July 31, 1992, an advertisement for the Equity Builders appears in another publication circulated in Topeka. Equity has recently distributed an advertising flyer to neighborhoods in Topeka. The flyer includes a quote from Benjamin Franklin: "A penny saved is a penny earned."

Bundy and Blair each worked for FCA prior to producing the Equity Builders. Both received copies of the Mortgage Controller.[10] In general, Bundy and Blair were unable to sell the Mortgage Controller. Bundy attributed the lack of sales to the $200 price of the product and to the commissions built into that $200 price. In addition, some real estate agencies were apparently concerned that their employees would attempt to sell the Mortgage Controller in derogation of their duties as employees.

Bundy essentially got the idea for the Equity Builders from the Mortgage Controller. Bundy, having sold the Mortgage Controller, was aware of its contents. In developing the Equity Builders, Bundy attempted to develop a better product and made a conscious effort to avoid copying FCA's product. Bundy thought that his thirty years of experience in finance would enable him to make a better and cheaper product than the Mortgage Controller.[11]

Bundy essentially quit working for FCA in December of 1991 and then turned his efforts to developing the Equity Builders. Bundy raised approximately $90,000 to found Equity Builders, Inc. Approximately $60,000 of that amount has already gone into developing the Equity Builders, and establishing Equity Builders, Inc. Equity Builders, Inc., at present, has approximately $15,000–$20,000 in retained earnings.

The mortgage on a person's home will typically comprise the largest component of personal debt. Most purchasers of homes do not understand how the payment of the mortgage works. The majority of persons do not understand that they have the right to prepay the principal. Prepaying the principal results in significant saving in the amount of interest to be paid during the term of the loan. By prepaying, mortgagors build up equity in their home quicker than by making only the payment required under the terms of the loan.

The advantages of a prepayment system like the Mortgage Controller or the Equity Builders are two-fold: First, each product's system simplifies the process of prepayment. The product sets forth the appropriate procedure for prepayment in relatively simple steps. As such, the product can motivate the mortgagor to make prepayments. In addition to being relatively simple to use, the product enables the user to track the progress of the mortgagor toward retiring the debt. Second, the coupons/notices which are sent to the lender clearly indicate how the prepayment is to be applied to the loan. Apparently, in the absence of clear instructions to the lender, prepayments may not be applied to the outstanding principal or the front-end of the loan. Instead, without instructions, lenders may apply the prepayment in some way that does not work to the borrower's maximum advantage.

FCA's internal organization is structured upon a multi-level marketing system.[12] Po-

---

**10.** Robert Bundy's affidavit indicates that between April 1991 and December 1991 he worked as an independent contractor attempting to sell the Mortgage Controller and that between June 1991 and December 1991, Ben Blair also worked as an independent contractor attempting to sell the Mortgage Controller. Bundy indicates that he and Blair invested approximately $10,000 in expenses into the business of selling FCA's product but were unable to sell the Mort-

gage Controller primarily because of its high price.

**11.** Bundy referred to developing Equity Builders as building a better "mousetrap."

**12.** Defendants' exhibit number six, a copy of FCA's "Compensation Plan," contains a graph explaining the manner in which this structure is constructed. Upon reaching certain criteria, namely certain sales in a certain time period,

sitions in the company are apparently based primarily on the sales attributable to each individual. An individual is credited for sales either personally made or for sales made by persons who are directly in line below that individual. FCA's sales strategy is not only designed to sell the product to consumers, but also to sell the product to individuals who, in turn, will sell the product to other individuals. Each person in the line is entitled to a commission on the end sale. Therefore, persons higher in the chain receive commissions from each sale attributable to them by sales associates below them.

To become an associate of FCA, a person is required to pay a sum of approximately $550. In return, FCA provides a copy of Mortgage Controller and certain training and marketing material. Persons who sell FCA's Mortgage Controllers are independent contractors.

FCA is attempting to market the Mortgage Controller nationwide. FCA's goal is to capture 2% of the approximate 80 million home mortgages, or $320,000,000 in sales (2% × 80,000,000 = 1,600,000; 1,600,000 × $200 = $320,000,000).[13] In five years FCA anticipates surpassing that goal "due to the phenomenal power of the sales force we are developing."

Gary Ott, president of FCA, has on several occasions told Bundy something to the effect that FCA's copyright on the Mortgage Controller would not "hold up" in court, but that FCA could always sue to enforce the copyright. Ott has apparently also made that statement at meetings to other FCA representatives.

Equity Builders' only product is the Equity Builders. If a preliminary injunction were entered, the corporation would be unable to attract additional investors and would essentially force the defendants out of business.

The defendants intend to market the Equity Builders in a manner they were unable to market the Mortgage Controller. As an example, the defendants were attempting to convince real estate companies to offer the Equity Builders to new home purchasers. Bundy thought that the lower price and a better marketing strategy would make it easier to sell the Equity Builders than the Mortgage Controller. The defendants are not using the multi-level marketing system used by FCA to sell the Mortgage Controller.

Prior to marketing the Equity Builders, Bundy obtained the opinion of an attorney who determined that the Equity Builders did not infringe FCA's copyright on the Mortgage Controller. The defendants have sold less than 100 copies of the Equity Builders.[14] The defendants have sold the Equity Builders in Topeka, Kansas and Denver, Colorado.

Other prepayment products are available. Examples of such products are computer programs, bi-weekly payment plans and instructional books explaining prepayment. Some instructional books tend to be overly technical for average consumers.

Obviously, a person who understood the principle of prepayment could simply use an amortization schedule to essentially achieve the same result as both products. However, as the principal of prepayment is apparently not well-understood, most debtors do not use that option. In addition, simply handing a mortgagor an amortization schedule and explaining the principle of prepayment does not generally motivate the home owner.

---

the person is given a certain title. Ranking each of the titles from highest to lowest: National Financial Manager; Executive Financial Manager; Senior Financial Manager; Financial Manager; Assistant Financial Manager; Affiliate. There are approximately 400 to 500 National Financial Managers; there are approximately 3,000 to 4,000 Executive Financial Managers.

Persons higher in the structure apparently train sales associates lower in the chain. Persons higher in the chain may also be required to make an investment of several thousand dollars.

**13.** This goal is found in an article titled "In The Field of Dreams" in the July–August 1992 edition of "the Liberty Connection," "the magazine for Financial Control Associates."

**14.** Defendants have sold 37 Equity Builders directly to consumers and have sold approximately 83 to real estate companies for $199 who receive one or two copies of the product.

## Application for a TRO

On August 13, 1992, the court held a phone conference to discuss the status of this case. At the suggestion of the court and upon the agreement of the parties, a hearing on the application for a preliminary injunction was set for August 20, 1992. The motion for a TRO is therefore effectively moot. The plaintiff's motion to appear pro hac vice was granted.

## Conclusions of Law

### Subject Matter Jurisdiction and Venue

Subject matter jurisdiction exists under 28 U.S.C. § 1338(a), which grants federal courts original and exclusive jurisdiction over copyright infringement claims.[15] Venue is apparently appropriate under 28 U.S.C. § 1400(a).

### Preliminary Injunctions

This court has authority to issue preliminary injunctions. *See* Fed.R.Civ.P. 65. Under 17 U.S.C. § 502, this court is specifically authorized to grant a preliminary injunction "on such terms as [the court] may deem reasonable to prevent or restrain infringement of a copyright."[16]

A preliminary injunction is an extraordinary remedy which is granted as the exception rather than the rule. *GTE v. Williams,* 731 F.2d 676, 678 (10th Cir.1984).

---

**15.** The plaintiffs also allege diversity of citizenship.

**16.** FCA contends, without authority, that § 502 "does not require courts to consider irreparable harm, to balance hardships, or do anything else other than prevent copyright infringement." The court believes this statement to be a loose and inaccurate characterization of the appropriate standards for determining whether a preliminary injunction is warranted. Notwithstanding that argument, FCA proceeds to analyze this case under the four factor test traditionally applied to motions for preliminary injunctions.

In 3 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 14.06[A] (1992) (hereinafter *Nimmer*), the author comments:

According to the predominant test, the moving party must show "either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits [are] raised and the balance of hardships tips sharply in its favor." These two poles are in reality the extremes of one continuum. "[T]he weaker the case on the merits, the stronger the probability of injury must be in order for a preliminary injunction to be granted." It is "the prevailing view that a showing of a prima facie case of copyright infringement or reasonable likelihood of success on the merits raises a presumption of irreparable harm." Therefore, under the first standard set forth above, the plaintiff's burden for obtaining a preliminary injunction in copyright cases collapses to showing likelihood of success on the merits, without a detailed showing of danger of irreparable harm. Of course, that presumption does not preclude the plaintiff from showing actual concrete damage in a given case. Conversely, a mere showing of irreparable injury without showing any likelihood of success on the merits is obviously inadequate.

A variant from the foregoing test requires that "the moving party 'establish possible irreparable injury and either (1) probable success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.'" Given the presumption of irreparable injury noted above, this test is analytically identical to that quoted above. The Second and Ninth Circuits generally follow this test.

In a departure from the above tests, some other courts invoke four factors to gauge the appropriateness of injunctive relief: (1) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; (2) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; (3) whether the plaintiff has at least a reasonable likelihood of success on the merits; and (4) whether the granting of a preliminary injunction will disserve the public interest." In this writer's view, judicious application even of those four factors should also boil down to the same test set forth above. As already noted, the first factor—proving irreparable harm—should not be invoked, as such harm is presumed in copyright cases in which the plaintiff demonstrates likely success on the merits. The second factor—balance of hardships—is also not usually invoked in copyright cases. "If that were the correct standard, then a knowing infringer would be permitted to construct its business around its infringement." Likewise, the fourth factor—public interest—rarely arises: "[I]t is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing misappropriation of the skills, creative energies, and resources which are invested in the protected work." Thus, in most cases it is the third factor—reasonable likelihood of success—which is determinative.

In *Paramount Pictures,* this court looked to the four factor test set forth below. 724 F.Supp. at 813.

"When deciding whether to issue a preliminary injunction, a district court almost always faces an abbreviated set of facts and must hypothesize the probable outcome of a case and the probable harm to the parties." *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195 (10th Cir.1992). Accordingly, the grant or denial of a preliminary injunction rests within the sound discretion of the trial court. *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 557 (10th Cir. 1984).

The primary purpose of a preliminary injunction is to preserve the *status quo* pending a final resolution of the merits, in order that the trial court could then render a meaningful decision. *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195 (10th Cir. 1992); *Tri–State Generation v. Shoshone River Power, Inc.*, 805 F.2d 351, 355 (10th Cir.1986).

The movant has the burden to establish by clear proof its right to a preliminary injunction. *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1185 (10th Cir.1975). Mere allegations are not sufficient. *Kansas City, Kan. Frat. v. City of Kansas City*, 620 F.Supp. 752, 768 (D.Kan. 1984). The movant's burden is particularly heavy when the injunction sought would essentially grant plaintiff a substantial portion of the relief the plaintiff would later recover upon a trial of the merits. *GTE*, 731 F.2d at 679; *Kingsford Products Co. v. Kingsford, Inc.*, 674 F.Supp. 1428, 1432 (D.Kan.1987).

To obtain a preliminary injunction, the moving party must establish:

(1) it will suffer irreparable injury unless the injunction issues;

(2) the threatened injury to the movant outweighs whatever damage the injunction may cause the opposing party;

(3) the injunction would not be adverse to the public interest; and

(4) there is a substantial likelihood that the movant will eventually prevail on the merits.

*Resolution Trust Corp. v. Cruce*, 972 F.2d 1195 (10th Cir.1992) (citation omitted); *City of Chanute v. Kansas Gas & Elec. Co.*, 754 F.2d 310, 313 (10th Cir.1985).

The Tenth Circuit has adopted a modified interpretation of the fourth element, "likelihood of success." " 'When the other three requirements for a preliminary injunction are satisfied, it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation.' " *City of Chanute*, 754 F.2d at 314 (quoting *Otero Savings and Loan Association v. Federal Reserve Bank*, 665 F.2d 275, 278 (10th Cir. 1981)); *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195 (10th Cir.1992).

In *Clark Equipment Co. v. Harlan Corp.*, 539 F.Supp. 561, 567 (D.Kan.1982), Judge Saffels commented that the "test for obtaining a preliminary injunction in a copyright case is slightly less rigorous than in most cases, because the plaintiff is entitled to preliminary injunction even without a detailed showing of irreparable harm if the plaintiff can show probable success on the merits or a *prima facie* case of infringement." In *Autoskill, Inc. v. National Education Support Systems, Inc.*, 793 F.Supp. 1557 (D. New Mexico 1992), the district court commented:

The issue on this motion for preliminary injunction is whether the evidence presented on this motion convinces [the court] that the plaintiff is likely to prevail at trial. Melville B. Nimmer & David Nimmer, 3 *Nimmer on Copyright*, 14–81–82 (1991 ed.) The issue is not whether infringement has been established as a matter of law. *Id.*

*Autoskill*, at 1562. Later in that opinion, the court, after noting that the Tenth Circuit has not addressed this issue, specifically agreed with Judge Saffels' analysis in *Harlan*. *Id.* at 1572.

In *Paramount Pictures v. Video Broadcasting Systems*, 724 F.Supp. 808, 822 (D.Kan.1989), this court stated: "For purposes of a preliminary injunction, a presumption of irreparable injury or harm is presumed upon showing a trademark or copyright infringement.... The presump-

tion is undercut when the plaintiff has delayed seeking injunctive relief." (citations omitted).

## Copyright Law

"The source of Congress' power to enact copyright laws is Article I, § 8, cl. 8, of the Constitution, which authorizes Congress to "secur[e] for limited Times to Authors ... the exclusive Right to their respective Writings." *Feist Pub. v. Rural Tel. Serv.,* —— U.S. ——, ——, 111 S.Ct. 1282, 1287, 113 L.Ed.2d 358, 369 (1991).[17] "The copyright laws, as part of the overall protection afforded intellectual property, were designed only to protect 'original works of authorship fixed in any tangible medium of expression.'" *Bellsouth Advertising & Pub. v. Donnelley Inf. Pub.,* 933 F.2d 952, 957 (11th Cir.1991) (quoting 17 U.S.C. § 102(a) (1988)). "[C]opyright assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Feist,* —— U.S. at ——, 111 S.Ct. at 1290, 113 L.Ed.2d at 372.

The Copyright Act is codified in Title 17. "Copyright protection subsists, in accordance with this title, in original works of authorship filed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device...." 17 U.S.C. § 102(a). "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept principle or discovery, regardless of the form in which it is described, explained, illustrated or embodied in such work." 17 U.S.C. § 102(b).

Under 17 U.S.C. § 106 the owner of a copyrighted work has the exclusive right (1) to reproduce the copyrighted work in copies; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies of the copyrighted work to the public by sale or other transfer of ownership. 17 U.S.C. § 106(1)–(3).[18]

■ "To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying [19] of constituent elements of the work that are original." *Feist,* —— U.S. ——, 111 S.Ct. 1282, 113 L.Ed.2d 358. If, however, the only material that has been copied are those elements of the copyright holder's work which are not protectable, then the resulting "copy" does not constitute an infringement. *Gates Rubber Co. v. Bando American, Inc.,* 798 F.Supp. 1499, 1511 (D.Colo. 1992); *Feist,* —— U.S. at ——, 111 S.Ct. at 1295, 113 L.Ed.2d at 371 ("The mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the sine qua non of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author."); 2 *Nimmer* § 8.01[D] ("Even if the defendant has copied from the plaintiff's copyrighted work, if the only material thus copied are those ·elements of plaintiff's work which are not protectable, then the resulting copy will not constitute an infringement.")

Ownership of the copyright can in turn be broken down into constituent parts:

---

**17.** In *Feist,* the Supreme Court held that alphabetical listings of names, accompanied by towns and telephone numbers, in a telephone book were not copyrightable. Because the plaintiff's product lacked originality, the phone book was not protected by copyright law. The Court specifically rejected the "sweat of the brow" theory, which accorded copyright protection as a reward for the hard work that went into compiling facts.

**18.** Copyrights are distinguishable from patents. "Originality is the sole standard of copyrightability. Unlike patentable subject matter, copyrightable subject matter need not be novel—

new—or nonobvious—an advance over the prior art." I Paul Goldstein, *Copyright* § 1.2.2.3 (1989). "[A] copyright, unlike a patent, does not confer an absolute monopoly over the expression but only a right of control over the works which are derived from the copyrighted work." *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1375 (5th Cir.1981).

**19.** " 'Copying' " is the shorthand reference to the act of infringing any of the copyright owner's five exclusive rights set forth at 17 U.S.C. § 106." *Paramount,* 724 F.Supp. 808, 819 (D.Kan.1989).

(1) originality in the author; (2) copyrightability of the subject matter; (3) citizenship status of the author such as to permit a claim of copyright; (4) compliance with applicable statutory formalities; and (5) (if the plaintiff is not the author) a transfer of rights or other relationship between author and plaintiff so as to constitute the plaintiff the valid copyright claimant. Melville Nimmer and David Nimmer, 3 *Nimmer on Copyright* § 13.01[A] at 13–5—13–6 [hereafter *Nimmer*] (1991) citations omitted). *Gates Rubber Co.*, 798 F.Supp. at 1504.

■ Pursuant to 17 U.S.C. § 410(c), the certificate of registration of the copyright is prima facie evidence of the validity of the copyright and of ownership. *Gates Rubber*, 798 F.Supp. at 1505; *Autoskill*, at 1562. Once the plaintiff submits its registration of copyright, there is a presumption that the copyright is valid and that the plaintiff is entitled to copyright protection. *Gates Rubber*, 798 F.Supp. at 1505.

Once the presumption of ownership is established, defendant has the burden of overcoming it ... Once the presumption of ownership is raised and successfully established, plaintiff must then establish that defendant copied its protected work.

*Id.* (citations omitted).

Direct evidence of copying is rarely available. *Baxter v. MCA, Inc.*, 812 F.2d 421, 423 (9th Cir.1987). For this reason, copying may be inferred by resorting to a two pronged test involving circumstantial evidence of: (1) the defendant's access to the copyrighted work and (2) the substantial similarity of defendant's work to the copyrighted work. *Atari[, Inc. v. North American Philips Consumer Electronics Corp.]*, 672 F.2d [607,] at 614 [ (7th Cir.1982) ]. To succeed, plaintiff must prove both prongs.

*Autoskill*, at 1563. "If defendant offers evidence of independent creation, the plaintiff has the burden of proving that the defendant in fact copied the protected material." *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1375 (5th Cir.1981).

"Just as copying is an essential element of copyright infringement, so substantial similarity between the plaintiff's and defendant's works is an essential element of actionable copying." 3 *Nimmer* § 13.03[A] (footnotes omitted).

It is clear that slight or trivial similarities are not substantial and are therefore non-infringing. But it is equally clear that two works may not be literally identical and yet, for purposes of copyright infringement, may be found to be substantially similar. The problem, then, is one of line drawing. Somewhere between the one extreme of no similarity and the other of complete and literal similarity lies the line marking off the boundaries of "substantial similarity." Judge Learned Hand has said that this line "wherever it is drawn will seem arbitrary" and that "the test for infringement of a copyright is of necessity vague."

3 *Nimmer* § 13.03[A] (footnotes omitted). *See Autoskill*, at 1568–1571 (discussing whether there is substantial similarity between two computer programs).

The clearest example of copying is of course a verbatim usurpation of another's work. Obviously, such a copy would infringe upon a valid copyright. Copyright law, however, protects the copyright holder beyond verbatim copying.

The mere fact that the defendant has paraphrased rather than literally copied will not preclude a finding of substantial similarity. Copyright "cannot be limited literally to the text, else a plagiarist would escape by immaterial variations."

Balanced against this principle is the countervailing consideration that copyright does not protect against the borrowing of abstract ideas contained in the copyrighted work. Therefore, if the only similarity between plaintiff's and defendant's works is that of the abstract idea, there is an absence of *substantial* similarity and hence no infringement results.

3 *Nimmer* § 13.03[A][1] (footnotes omitted).[20]

---

**20.** Tests for determining "substantial similarity" include the abstractions test, the pattern test, the

"The most fundamental axiom of copyright law is that "[n]o author may copyright his ideas or the facts he narrates." *Feist,* —— U.S. at ——, 111 S.Ct. at 1285, 113 L.Ed.2d at 368 (quoting *Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 556, 105 S.Ct. 2218, 2228, 85 L.Ed.2d 588 (1985)). Therefore, "it is a basic rule under copyright law that protection may extend to expression but never to ideas." *Autoskill,* at 1564 (citing *Baker v. Selden,* 101 U.S. (11 Otto) 99, 25 L.Ed. 841 (1880)). In *Feist,* the Court commented:

> to qualify for copyright protection, a work must be original to the author.... Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity.... To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how 'crude, humble or obvious' it might be." 113 L.Ed.2d at 369.... Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not result of copying. To illustrate, assume that two poets, each ignorant of the other, compose identical poems. Neither work is novel, yet both are original and, hence, copyrightable. (citations omitted).

Originality is a constitutional requirement. —— U.S. at ——, 111 S.Ct. at 1287, 113 L.Ed.2d at 369.[21] "Even if a work

qualifies as a copyrightable compilation, it receives only limited protection ... [F]acts contained in existing works may be freely copied because copyright protects only the elements that owe their origin to the compiler—the selection, coordination, and arrangement of facts." *Feist,* —— U.S. at —— – ——, 111 S.Ct. at 1294–1295, 113 L.Ed.2d at 377–378.

Defenses to Copyright Infringement

Several defenses may be asserted by the alleged copyright infringer. The defendants in this case assert the "blank form" doctrine and the "merger" doctrine. The court believes both defenses are relevant to this case.

■ The courts have recognized a defense referred to as the "blank form" doctrine. The doctrine has its origin in *Baker v. Selden,* 101 U.S. (11 Otto) 99, 25 L.Ed. 841 (1880). In *Selden,* the plaintiff held a copyright on a book which purported to explain a new system of bookkeeping. Annexed to the introductory essay explaining the system of bookkeeping were certain forms or blanks consisting of ruled lines and headings which illustrated the system and showed how to use the system. The defendant issued a book that achieved the same result as the plaintiff's system, but instead used a different arrangement of the columns and used different headings.

The Supreme Court held that the "art" or idea explained in the plaintiff's book was not capable of protection under copyright law. By publishing the book without obtaining a patent upon the art, the art was given to the public. *Id.* at 103. "[W]here the art it teaches cannot be used without employing the methods and diagrams used

---

total concept and feel test as well as other tests and approaches. *See* 3 *Nimmer* § 13.-03[A][1][a]–[d]. The plaintiff in this case simply suggests that the defendants' product is substantially similar and has not demonstrated the specific applicability of any test.

**21.** Although in some early copyright cases the distinction was not recognized, it is now clearly established, both as a matter of congressional intent and judicial construction, that the originality necessary to support a copyright merely calls for independent creation, not novelty. Thus a work will not be denied

copyright protection simply because it is substantially similar to a work previously produced by others, and hence is not novel. Originality means only that the work owes its origin to the author, i.e., is independently created, and not copied from other works. Therefore a work is original and may command copyright protection even if it is completely identical with a prior work, provided it was not copied from such prior work but is rather a product of the independent efforts of its author.

1 *Nimmer* § 2.01[A] (footnotes omitted).

to illustrate the book, or such as are similar to them, such methods and diagrams are to be considered as necessary incidents to the art, and given therewith to the public." *Id.* The Court then commented that "[t]he use by another of the same methods of statement, whether in works or illustrations, in a book published for teaching the art, would, undoubtedly, be an infringement of copyright." *Id.* at 104. The court concluded with the following statement: "The conclusion to which we have come is that blank account-books are not the subject of copyright." *Id.* at 104.

The courts have struggled with the precise meaning and application of *Selden.* The concluding statement in *Selden* is capable of overreaching and misapplication. *Kregos v. Associated Press*, 937 F.2d 700, 708 (2nd Cir.1991). One authority suggests that the original doctrine of *Selden* may be expressed as follows:

> [W]here the use of the "art," *i.e.*, the idea, which a copyrighted work explains (or embodies) necessarily requires a copying of the work itself, then such copying will not constitute an infringement of copyright. However, if such copying occurs not in using the art but rather in explaining it, then such copying will constitute an infringement.

1 *Nimmer* § 2.18[B].

In *Kregos*, the court of appeals held that the creator of a baseball pitching form was entitled to a trial on his copyright claim. The form displayed information concerning the past performances of the opposing pitchers scheduled to start each day's baseball game. In discussing plaintiff's claim, the court of appeals discussed the "blank documents" doctrine.

> Though there are some statements suggesting broadly that no blank forms are copyrightable, *see Bibbero Systems, Inc. v. Colwell Systems, Inc.*, 893 F.2d 1104, 1106–07 (9th Cir.1990), *amended, reh'g denied; M.M. Business Forms Corp. v. UARCO, Inc.*, 472 F.2d 1137, 1139 (6th Cir.1973), many courts have recognized that there can be protectable elements of forms that include considerable blank space. *See, e.g., Harcourt,*

*Brace & World, Inc. v. Graphic Controls Corp.*, 329 F.Supp. 517, 524 (S.D.N.Y.1971) (answer sheets); *Norton Printing Co. v. Augustana Hospital*, 155 U.S.P.Q. 133 (N.D.Ill.1967) (laboratory test forms). *See generally Whelan Associates, Inc. v. Jaslow Dental Laboratory, Inc.*, 797 F.2d 1222, 1242–43 (3d Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987).

> 5. We are concerned with protectable elements in the selection (and perhaps arrangement) of the categories of information to be recorded on the forms. There is widespread agreement that a work containing a blank form may be copyrightable because of the protectable elements of the textual matter accompanying the form. (citations omitted).

> The regulations of the Copyright Office are careful to preclude copyright registration to:

>> Blank forms, such as ... account books, diaries, bank checks, scorecards, address books, report forms, order forms and the like, which are designed for recording information *and do not in themselves convey information;*

> 37 C.F.R. § 202.1(c) (1990) (emphasis added).

> Of course, a form that conveys no information and serves only to provide blank space for recording information contains no expression or selection of information that could possibly warrant copyright protection. *See, e.g., John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 971–72 (11th Cir.1983) (check stubs). At the same time, it should be equally obvious that a writing that does contain a selection of categories of information worth recording, sufficiently original and creative to deserve a copyright as a compilation of facts, cannot lose that protection simply because the work also contains blank space for recording the information.

937 F.2d at 708.

In comparison, in *Bibbero Systems, Inc. v. Colwell Systems, Inc.*, 893 F.2d 1104,

1106–1107 (9th Cir.1990), the court of appeals commented that "[a]lthough blank forms are generally not copyrightable, there is a well-established exception where text is integrated with blank forms. Where a work consists of text integrated with blank forms, the forms have explanatory force because of the accompanying copyrightable textual material."

■ In addition to the "blank form" doctrine, a related defense recognized by the courts is the merger doctrine. The defense concerns the idea-expression dichotomy. "[T]he idea/expression or fact/expression dichotomy applies to all works of authorship." *Feist,* —— U.S. at ——, 111 S.Ct. at 1290, 113 L.Ed.2d at 372.

We have already seen that copyright protects expression but that ideas are statutorily free to all. In some circumstances, however, there is a "merger" of idea and expression, such that a given idea is inseparably tied to a particular expression. In such instances, rigorously protecting the expression would confer a monopoly over the idea itself, in contravention of the statutory command. To prevent that consequence, courts have invoked the merger doctrine. In other words, given the dilemma either of protecting original expression even when that protection can be leveraged to grant an effective monopoly over the idea thus expressed, or of making the idea free to all with the concomitant result that the plaintiff loses effective copyright protection even over the precise original expression used, copyright law chooses the latter course.

3 *Nimmer* § 13.03[B][3].

In *Mason v. Montgomery Data, Inc.,* 967 F.2d 135 (5th Cir.1992), the plaintiff sued the defendant claiming copyright infringement of certain real estate maps created and copyrighted by the plaintiff. The district court held that the maps were not copyrightable under the idea/expression merger doctrine. The court of appeals reversed, finding that the maps were copyrightable. In reaching that conclusion, the court of appeals discussed the merger doctrine.

While a copyright bars others from copying an author's original expression of an idea, it does not bar them from using the idea itself. "Others are free to utilize the 'idea' so long as they do not plagiarize its 'expression.'" *Herbert Rosenthal Jewelry Corp. v. Kalpakian,* 446 F.2d 738, 741 (9th Cir.1971). In some cases, however, it is so difficult to distinguish between an idea and its expression that the two are said to merge. Thus, when there is essentially only one way to express an idea, "copying the 'expression' will not be barred, since protecting the 'expression' in such circumstances would confer a monopoly of the 'idea' upon the copyright owner free of the conditions and limitations imposed by the patent law." *Id.* at 742. By denying protection to an expression that is merged with its underlying idea, we "prevent an author from monopolizing an idea merely by copyrighting a few expressions of it." *Toro Co. v. R & R Products Co.,* 787 F.2d 1208, 1212 (8th Cir.1986). (footnotes omitted).

.   .   .   .   .

To determine whether the doctrine is applicable in any case, the court must "focus on whether the idea is capable of various modes of expression." *Apple Computer[, Inc. v. Franklin Computer Corp.],* 714 F.2d [1240,] at 1253 [(3rd Cir.1983)]. Thus, the court must first identify the idea that the work expresses, and then attempt to distinguish that idea from the author's expression of it. If the court concludes that the idea and its expression are inseparable, then the merger doctrine applies and the expression will not be protected. Conversely, if the court can distinguish the idea from its expression, then the expression will be protected because the fact that one author has copyrighted one expression of that idea will not prevent other authors from creating the copyrighting their own expressions of the same idea. In all cases, "the guiding consideration in drawing the line is the preservation of the balance between competition and pro-

tection reflected in the patent and copyright laws." *Herbert Rosenthal Jewelry*, 446 F.2d at 742.

*Id.* at 138. *See Kregos*, 937 F.2d at 705–707 (discussing merger doctrine; refusing to apply merger doctrine to pitching form); *Autoskill*, at 1566–1568; *Gates Rubber*, 798 F.Supp. at 1516–1517.

"The issue of merger is more properly considered in a concrete factual setting as a defense against extending protection rather than as [a] bar to copyrightability." *Gates Rubber*, at 1512 (citing *Nimmer*); *Kregos*, 937 F.2d at 705; *but see Kern River Gas Transmission Co. v. Coastal Corp.*, 899 F.2d 1458, 1460–1464 (5th Cir.) (because the idea and its expression embodied in the plaintiff's maps are inseparable, "the maps at issue are not copyrightable"), *cert. denied*, — U.S. —, 111 S.Ct. 374, 112 L.Ed.2d 336 (1990)).

■ The court concludes that FCA has failed to demonstrate a substantial likelihood of success on the merits.[22] As FCA concedes, the idea of mortgage prepayment is not copyrightable. While FCA contends that it is only seeking to enforce the protectable expressions, substantial portions of the Mortgage Controller are not copyrightable. Although FCA attempts to focus on particular aspects of expression, at this stage of the proceedings, the court is unpersuaded that much of the expression is original or displays even a modicum of creativity. For purposes of deciding this motion, the court assumes, without deciding, that some portions or aspects of the Mortgage Controller are capable of copyright protection.

Many of the purported examples of "copying" are trivial or frivolous. For example, the plaintiff argues that the defendants' decision to place the Equity Builders in a cover, to print the product on 8½ by 11 inch paper and to use tabs to separate sections is evidence of copyright infringement. Similarly, the plaintiff's complaint that the defendants have used a quotation from Benjamin Franklin essentially suggests that it has cornered the market on the use of "common sense" quotations from Benjamin Franklin. The court does not believe that the defendants' use of a quote expressing an axiom coined by Benjamin Franklin in any way serves as a source of confusion or copyright infringement.

Other examples of "copying" identified by the plaintiff border on the absurd. For example, the plaintiff complains that the defendants describe the Equity Builders as easy to use. In comparison, FCA refers to the Mortgage Controller as "easy to follow." It is difficult for the court to fathom any significantly different description of a product offered for use by the public, nor does the court believe that use of phrases indicating that the Equity Builders is a fast, effective means of reducing debt is any indication of infringement.[23] Most descriptions of products contain certain amounts of "puffing" or generally favorable self-descriptions.

In this same vein, the use of columns in expressing the amortization of loans involves no originality, nor can the plaintiff claim a copyright to the facts contained in those tables. The use of columns to express and align numbers, contrary to FCA's contentions, is largely unremarkable.[24] This observation also applies to the use of charts. The use of notices and coupons between lenders and borrowers falls within this same analysis. Moreover, Equity Builders' coupons, while similar in function to the notices in the Mortgage

---

**22.** While the court has considered all of the specific examples the plaintiff alleges are evidence of copying, the court will not endeavor to address each and every argument advanced by the plaintiff. In addition, many of the issues raised by the parties overlap other arguments and concepts that courts and commentators have endeavored to separate, albeit often times unsuccessfully. The court will not attempt to mince through each argument and fully discuss these esoteric distinctions.

**23.** Apparently the use of descriptive marketing phrases like "Arcane accounting system," "Hopelessly complex" or "Difficult, practically impossible to use" would not be evidence of infringement.

**24.** Some of these items, particularly columns and tables, would appear to be properly categorized as blank forms.

Controller, do not copy the plaintiff's product.

Some of the language used in the explanations, advertisements, instructions and headings of the columns of the Equity Builders and the Mortgage Controller is similar. However, many of the words used such as principal and interest are commonly used to describe those concepts. The nature of accounting inevitably requires the use of certain terms in each of the products. The similar arrangement of the limited number of relevant facts is to a large extent necessary as the products are so similar in function. Under these circumstances, the defendants have not engaged in some opaquely veiled attempt at plagiarism, but instead appear to have created their own expression of the idea of mortgage prepayment. *See Matthew Bender & Co. v. Kluwer Law Book Publisher, Inc.*, 672 F.Supp. 107 (S.D.N.Y.1987) (plaintiff's charts, which used the only sensible categories which could have been used to compile data, not copyrightable).

The explanations of the operation and use of each product, by the nature of each product and its intended purpose, are necessarily similar. The fact that both products are designed to aid the borrower in early retirement of the debt and the accelerated build-up of equity will inevitably lead to certain unavoidable similarities. In short, many of the ideas found in the Mortgage Controller merge with their expression. As such, Equity Builders, while similar in function and purpose, does not appear to infringe FCA's copyright. Most of FCA's purported examples of copying or substantial similarity are trivial. If FCA's arguments are correct, FCA's copyright would essentially grant FCA a copyright on the idea of a prepayment system involving the use of columns, recording systems and coupons.[25]

In addition to the serious questions concerning the issue of infringement, the court concludes that the balance of harms clearly weighs against granting the preliminary injunction. Issuance of an injunction would devastate the defendants' business.

In comparison, the plaintiff has not demonstrated that denial of the motion for a preliminary injunction will cause any appreciable damage. The plaintiff did not sufficiently quantify the possible extent of its damages if the court did not issue the injunction. The plaintiff argued and presented testimony that failure to issue an injunction would undermine FCA associates' confidence in validity of Mortgage Controller's copyright. FCA associates, however, had reason to be skeptical of the strength of the copyright because Ott informed them that the copyright would not hold up in court but would entitle the company to sue.

Given the court's serious concerns about the apparent weaknesses in certain aspects of the plaintiff's copyright and the court's conclusion that the defendants have not infringed FCA's copyright, the presumption of irreparable injury is essentially rebutted and the balance of harm swings decidedly in the defendants' favor.

Although not directly countered by FCA, the court places little, if any, reliance on the defendants' argument that FCA has delayed in bringing this action. The defendants began producing the Equity Builders in April 1992. While it is not entirely clear when FCA first learned of the Equity Builders, FCA's "delay" in this case is distinguishable from the delay present in *Paramount Pictures*, 724 F.Supp. at 822–23, as the delay appears at most to be four or five months. In addition, between June and July 1992, the parties were apparently attempting to reach some amicable agreement prior to filing in federal court.

### Deceptive Trade Practices and Unfair Competition

■ In their briefs, each side dedicated approximately one page to discussing these claims. During the evidentiary hearing the plaintiff focused exclusively on its claim for copyright infringement. At the conclusion of the hearing, the court offered the

---

**25.** The examples of alternatives provided by FCA at the evidentiary hearing were not particularly useful and did little, if anything, to demonstrate that there are other reasonable or effective ways to present a useable, prepayment product system in printed form.

parties an additional opportunity to brief the issues presented by this case and indicated that any issues not addressed would be considered abandoned. The plaintiff initially indicated that it desired to file an additional brief, but after hearing the defendants' position, opted to submit the matter on the basis of the arguments and evidence presented.

The court believes that the plaintiff's absence of argument during the hearing has waived these additional claims as further justification for issuing a preliminary injunction. Nevertheless, the court concludes that even had these additional claims been presented neither would serve, in conjunction with or independently of the copyright infringement claims, as sufficient bases for a preliminary injunction.

In *Powell v. Valentine*, 106 Kan. 645, 648, 189 P. 163 (1920), the Supreme Court of Kansas commented "that it is the duty of a subsequent trader, coming into an established trade, not to dress up his goods or market them in such a way as to cause confusion between his goods or business and that of a prior trader."

More recently, the Supreme Court of Kansas has commented:

> Generally it is recognized that copying or imitating circulars and advertisements is strong evidence of fraud and unfair competition, especially where the advertisement is calculated to deceive the public and to pass the goods off as those of another. (87 C.J.S., Trademarks, Etc., § 119, p. 402.) Where one manufactures a product similar to his former employer's product and sells such goods without distinguishing marks, using similar sales methods and advertisements in order to appropriate his good will, a charge of unfair competition has been sustained.

*Parsons Mobile Products*, 216 Kan. at 261, 531 P.2d 428. "This is a country of free enterprise based upon competition. The essential inquiry on any charge of unfair competition is good faith." 216 Kan. 256, 531 P.2d 428, Syl. ¶ 5.

This court's determination that FCA has not demonstrated a substantial likelihood of success on the merits of its copyright claims obviously undercuts the plaintiff's claim that the defendants have engaged in deceptive trade practices or unfair competition. Although the defendants' product is similar in purpose and function, the Equity Builders does not appear to be deceptive or to constitute unfair competition. The Equity Builders clearly and prominently displays its own mark and does not appear or purport to be an FCA product.

In sum, the plaintiff has failed to demonstrate substantial likelihood of success on its Kansas common law claims.

### Conclusion

In denying the plaintiff's application for a preliminary injunction, the court in no way denigrates the idea of mortgage prepayment or disparages the plaintiff's product. The court simply concludes that FCA has not met its burden of demonstrating a substantial likelihood of success on the merits and that the balance of harms lies against granting the motion. *See Feist*, —— U.S. at ——, 111 S.Ct. at 1297, 113 L.Ed.2d at 381. ("This decision should not be construed as demeaning Rural's efforts in compiling it's directory, but rather as making clear that copyright rewards originality, not effort.")

IT IS THEREFORE ORDERED that FCA's motion for a temporary restraining order and preliminary injunction (Dk. 3) is denied.

# EXHIBIT A

| PREPAYMENT OF PAYMENT# | 001 |
| --- | --- |
| EXACT PREPAYMENT | $39.74 |

CHECK #: _____ DATE

BORROWER:     . T. Michael Seale

ACCT. #     031692

In accordance with my borrower's right of prepayment, enclosed is a principal prepayment check as payment in full of this specific payment in my amortization schedule. Thank you for dismissing all interest charges related to this specific principal prepayment.

Copyright ©1991 by Financial Control Associates     Exclusively owned by Financial Control Associates

# EXHIBIT B

### PREPAYMENT INSTRUCTIONS

The enclosed check is payment in full for the payment number indicated. All interest charges relating to this payment should now be cancelled. Please credit my account accordingly.

Date _____     Payment # _____1_____

Check # _____     Prepayment Amount $ _____76.42_____

Acct. Number __4597073_____

New Acct. Number (If Applicable) _____

Borrower __Lois J. Summers_____

© 1992 Equity Builders, Inc.